Marta Brigida MELGAR DE
TORRES, Petitioner,

v.

Janet RENO, Attorney General, and
The Immigration and Naturaliza-
tion Service, Respondents.

Docket No. 98–4124.

United States Court of Appeals,
Second Circuit.

Heard Feb. 19, 1999.
Decided Aug. 19, 1999.

Anne Pilsbury, Central American Legal Assistance, Brooklyn, New York, for Petitioner.

Meredith E. Kotler, Assistant United States Attorney, New York, New York (Mary Jo White, United States Attorney for the Southern District of New York, Diogenes P. Kekatos and Sara L. Shudofsky, Assistant United States Attorneys on the brief), for Respondents.

Before: KEARSE and SACK, Circuit Judges, and STEIN, District Judge.*

Judge KEARSE dissents in a separate opinion.

STEIN, District Judge:

Petitioner Marta Brigida Melgar de Torres, a citizen of El Salvador, petitions for review of the order of the Board of Immigration Appeals ("BIA") affirming the immigration judge's denial of her requests for asylum and withholding of deportation pursuant to section 309(c)(4) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, Div. C., 110 Stat. 3009–626 (Sept. 30, 1996). Specifically, Melgar contends that she is entitled to relief because she has demonstrated a well-founded fear of persecution if she is returned to El Salvador on the grounds that she assisted her uncle in giving aid to the Marxist Farabundo Marti National Liberation Front ("FMLN") guerillas in that country and because he was allegedly killed for that aid.

In opposition, the Attorney General and the Immigration and Naturalization Service contend that the evidence does not support that fear, especially in light of the changed conditions in El Salvador since the signing of the 1992 peace accords there. For the reasons that follow, we conclude that the BIA's decision was supported by substantial evidence and we accordingly affirm the BIA's order and deny the petition.

*The Honorable Sidney H. Stein, of the United States District Court for the Southern District of New York, sitting by designation.

## FACTUAL BACKGROUND

The following evidence was presented at the hearing before the immigration judge ("IJ"):

In 1983, Melgar moved from the village of San Sebastian in El Salvador to the village of El Tablón; two years later, she met and married Jose Ulises Torres. However, eight months after the marriage, Jose Ulises left El Salvador for the United States to avoid conscription into the Salvadoran army. Once her husband emigrated, Melgar returned to San Sebastian to live with her uncle. Although Melgar's uncle was not an FMLN guerrilla, he helped the guerrillas by giving them food and allowing them to sleep in his house. Melgar assisted her uncle in those endeavors during the period of time that she lived in her uncle's home.

In November of 1992, Melgar's uncle was found murdered seven days after he left San Sebastian on a trip. Although Melgar does not know for certain who killed him, she believes the military did so because he had helped the guerrillas. Approximately one month after her uncle's death, soldiers came to her uncle's home—where Melgar continued to live with her aunt and cousins—and raped the women, including Melgar. After that incident, all of the women left San Sebastian for the capital city of San Salvador.

After Jose Ulises learned of the death of Melgar's uncle, he sent money to Melgar so she could join him in the United States. Melgar testified that she feared returning to the village of El Tablón because she believed that the military thought she was a guerrilla. Jose Ulises also testified that Melgar could not return to El Tablón because people in the town "were going to call her a guerrilla." At the time of the hearing, Jose Ulises was involved in a project to bring water to the village of El Tablón, which Jose Ulises claimed offends

the mayor of El Tablón because the mayor himself hopes to bring water to the village.

Melgar has two daughters out of wedlock, born in 1990 and 1992. Both daughters remained in El Salvador with Melgar's mother until 1996, when they were brought illegally to the United States.

Documentary evidence was submitted by Melgar and the INS at the hearing before the IJ, and additional evidence was submitted after the hearing was completed but before the IJ rendered her decision. At the hearing, the INS submitted an April 29, 1995 *New York Times* article titled "El Salvador, 3 Years Later: A Country Remade by Peace." That article discusses the changes brought about by the 1992 peace accords, and reports that 1) the "National Guard, the Treasury Police and other security organizations that once terrorized the population have been disbanded and replaced by a new National Civilian Police;" 2) the army has been reduced by two-thirds; 3) "more than 100 senior officers accused of human rights violations have been purged;" and 4) the FMLN "has the second-largest delegation in the Legislative Assembly," although it did report that criminal gangs have become widespread in El Salvador and some elements of the peace accords have not yet been implemented.

After the hearing, the INS submitted both the 1995 and 1996 State Department Profiles of Asylum Claims & Country Conditions ("Country Profiles"). These Country Profiles demonstrate that the conditions in El Salvador changed greatly after Melgar emigrated. The 1995 Country Profile states that "all [asylum] claims from Salvadoran applicants should be reviewed in light of the sweeping changes which have taken place in that country" since the last guerrilla combat units were demobilized in December 1992. The 1995 Country Profile also points out that "[m]ost asylum claims from El Salvador still derive from events that occurred prior to the final implementation of the peace accords" and it notes that while the "level

of violence in El Salvador remained high, . . . [t]here were no confirmed cases of politically motivated killings" and that the "number of extrajudicial killings, torture, disappearances, and mistreatment of detainees declined significantly in 1994."

The 1996 Country Profile reiterates that asylum claims from Salvadoran applicants should be viewed in light of the "sweeping changes" that have taken place since the peace accords and notes that the U.N. Human Rights Commission removed El Salvador from its list of countries subject to permanent monitoring and that the U.N. Secretary General declared the peace process "irreversible." It also discusses the demobilization of the military-controlled National Police, the deployment of the National Civilian Police and the decline in political violence from prior years. In addition, the 1996 Country Profile cautions that "although violent organized criminal gangs . . . have taken the place of political violence as the major security concern in El Salvador, many asylum applications continue to treat the situation as merely an extension of the civil war."

Melgar submitted a number of articles and documents demonstrating incidents of politically motivated violence which occurred after the peace accords were signed. However, most of these articles discuss the period immediately following the signing of the accords in 1992, not how conditions stood at the time of Melgar's deportation hearing. Of the seven newspaper articles submitted at the hearing, five were written in 1992, one in 1993 and one in 1995. The 1995 article discusses an armed group, the "Black Shadow," which threatened a local newspaper for disseminating false information about the group. Melgar also submitted a 1994 United Nations Joint Group Report dated October 22, 1994 that discusses politically motivated armed groups in El Salvador that were attempting to destabilize the peace process. The annex to the Joint Group Report lists politically motivated executions

and execution attempts that took place from March 1992 through February 1994.

Melgar provided the IJ with a 1993 affidavit from a professor at Stanford University that catalogs politically motivated acts of violence from 1992 through October 1993. However, that affidavit states that "[w]hen fully implemented, [the peace accord] has the capacity to significantly diminish repression and political persecution in El Salvador."

After the conclusion of the hearing, Melgar submitted additional articles from the period 1993—1995 which discuss the assassination of an FMLN leader (attributing it to a military death squad) and "nazi death squads" which were threatening to assassinate gangs and corrupt officials. She also submitted a 1996 article concerning the "street violence" in El Salvador.

*DISCUSSION*

■ Congress has created two alternative forms of relief for deportable aliens who claim that they will be persecuted if forced to return to their native countries— asylum and withholding of deportation. *See Zhang v. Slattery,* 55 F.3d 732, 737 (2d Cir.1995). Pursuant to § 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a), (the "Act"), an applicant for asylum in the United States must, as a threshold matter, establish that she is a "refugee" within the meaning of § 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). A "refugee" is a person who is unable or unwilling to return to her native country because of "persecution or a well-founded fear of persecution on account of" one or more of five enumerated grounds—i.e., "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 428, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Melendez v. United States Dep't of Justice,* 926 F.2d 211, 214 (2d Cir.1991). Once an individual proves either past persecution or a well-founded fear of future persecution on account of one or more of the five enumerat-

ed grounds, the Attorney General may, in her discretion, grant asylum pursuant to 8 U.S.C. § 1158. *See Zhang,* 55 F.3d at 737.

■ An alien has a well-founded fear when "a reasonable person in her circumstances would fear persecution if she were returned to her native country." *Carcamo–Flores v. INS,* 805 F.2d 60, 68 (2d Cir.1986). "Well-founded fear involves both a subjective and an objective component. The former may be based on the applicant's reaction to events that impinge on [her] personally; but to make it a well-founded fear, there must be other proof or objective facts that lend support to the applicant's subjective fear." *Melendez,* 926 F.2d at 215.

When an asylum applicant has demonstrated that she has been subjected to past persecution, there is a presumption that a well-founded fear of persecution exists. *See* 8 C.F.R. § 208.13(b)(1)(i); *see also Melendez,* 926 F.2d at 215. Once demonstrated, the burden shifts to the government to show, by a preponderance of the evidence, that country conditions have changed to such an extent that the petitioner no longer has a well-founded fear that she would be persecuted if she were to return to her native country. *See* 8 C.F.R. § 208.13(b)(1)(i).

■ As noted above, the second form of relief for aliens who claim that they will be persecuted if they return home is withholding of return, also known as withholding of deportation. To establish grounds for withholding of deportation, the applicant must prove that there is a "clear probability" that she will suffer persecution if returned to her native country, "i.e., that it is 'more likely than not that the [applicant] would be subject to persecution.'" *Melendez,* 926 F.2d at 215 (quoting *INS v. Stevic,* 467 U.S. 407, 413, 424, 104 S.Ct. 2489, 2492, 2498, 81 L.Ed.2d 321 (1984)). *See also* 8 C.F.R. § 208.16(b)(1). While withholding of deportation is nondiscretionary, "eligibility for this relief requires the higher ('clear probability') bur-

den of proof. An applicant who has failed to satisfy the requirements for asylum has necessarily failed to satisfy the requirements of withholding of [deportation]." *Zhang*, 55 F.3d at 738. Melgar is only appealing the denial of her application for asylum and therefore must only demonstrate a "well-founded fear of persecution."

*History of this Proceeding*

In a written decision dated July 31, 1996, the IJ denied Melgar's application for asylum and withholding of deportation. Despite a specific finding that the testimony of Melgar and her husband was "believable, consistent and sufficiently detailed," the IJ found that Melgar had failed to establish either past persecution or a well-founded fear of future persecution.

The IJ rejected Melgar's claim of a well-founded fear of persecution based upon membership in Jose Ulises' family on a number of grounds. First, Melgar failed to demonstrate that she was a recognized member of that social group in that she had two children with another man and she lived with her uncle for her last seven years in El Salvador. She was also unable to satisfy the IJ that Jose Ulises' participation in the water project would lead to her persecution. Finally, she failed to show that Jose Ulises' having avoided conscription would lead to her persecution since she had lived in El Salvador for seven years after he left the country without any threats or harm to her on account of his fleeing.

The IJ also found that Melgar did not demonstrate a well-founded fear of persecution due to her support of the FMLN for a number of reasons. Because Melgar's testimony failed to connect her or her uncle's having assisted the FMLN to her having been raped by soldiers, the IJ rejected her argument that her rape supported a well-founded fear of persecution. In addition, there was no evidence that the military harmed her uncle's family after she left, which undercut her argument that she will be persecuted because of her un-

cle's actions. Finally, the IJ found that her fear of persecution was undermined by the change in conditions in El Salvador.

In addition, the IJ rejected her claim that she suffered past persecution because of her Uncle's death on the basis that she could not demonstrate that her uncle was killed because of the aid he provided the guerrillas, let alone that he was killed in order to harm her. The IJ also held that her rape did not constitute past persecution because she could not testify to the soldiers' underlying motives.

The BIA, after an independent review of the record, affirmed the IJ's decision in a written decision dated March 9, 1998, with one member dissenting. The BIA determined that Melgar failed to demonstrate past persecution based on any enumerated ground because she could not prove a nexus between her uncle's death and a protected ground, *i.e.*, that he was killed on account of his political views. The BIA also found that Melgar's fear of persecution was undermined by the lack of evidence or claims that any harm has befallen her aunt, cousins or daughters after she left. The BIA—as had the IJ—recognized the change in country conditions in El Salvador after the signing of the 1992 peace accords and concluded that Melgar failed to demonstrate that she would be at risk of persecution.

*Standard of Review*

On appeal from a decision of the BIA, "findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive." 8 U.S.C. § 1105a(a)(4); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994). Therefore, the factual findings regarding Melgar's eligibility for asylum or withholding of deportation must be upheld if they are supported by substantial evidence. *See Saleh v. United States Dep't of Justice*, 962 F.2d 234, 238 (2d Cir.1992). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion.'" *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996) (citations omitted). The BIA findings of fact will be reversed "only if 'a reasonable fact-finder would have to conclude' otherwise." *Osorio,* 18 F.3d at 1022 (citations omitted). Thus, the substantial evidence test accords "substantial deference" to the BIA's findings of fact, *see Melendez,* 926 F.2d at 217–18, and the scope of review of an asylum decision is "exceedingly narrow." *See Carranza–Hernandez v. INS,* 12 F.3d 4, 7 (2d Cir.1993).

*Well–Founded Fear of Persecution on Account of a Protected Ground*

■ The IJ and BIA each ruled that Melgar had failed to demonstrate an objective basis for her belief that she will be persecuted on account of a protected ground, deciding that neither her uncle's death nor her own rape supports such a belief. There was substantial evidence to reach that determination, especially in light of the changed country conditions in El Salvador.[1]

■ There was substantial evidence for the BIA to determine that the death of Melgar's uncle does not lend support to her claim of a well-founded fear of persecution on account of her activities with the FMLN guerrillas. Melgar offered no direct evidence that her uncle was killed

because he had assisted the FMLN, or even that he was killed by the military, but instead contended that that is a reasonable assumption to make, given the conditions in El Salvador in 1992. However, even making that assumption, Melgar fails to offer any evidence upon which a reasonable person could rest a well-founded fear of persecution due to her uncle's acts. The absence of any claims that members of her uncle's family were persecuted after his death, in conjunction with evidence that her own mother and daughters continued to live in El Salvador after Melgar emigrated without harm, cuts against her argument that she has a well-founded fear of persecution on account of her uncle's actions.[2]

■ Melgar's rape by Salvadoran soldiers also does not provide a basis for a well-founded fear of persecution. She admits that she has no knowledge that the soldiers raped her because of her or her uncle's aid to the guerrillas. Because there is no evidence to suggest that the rape was anything but an act of random violence, it was reasonable to determine that her rape neither supports a well-founded fear of persecution on account of a ground enumerated by the Act nor constitutes past persecution as well.

Finally, the IJ and the BIA were entitled to determine that any reasonable fear of persecution that Melgar possesses is not

---

1. We do not share the dissent's concern that the BIA did not apply the correct legal standard of "well-founded fear" when reviewing Melgar's asylum application. The BIA decision explicitly states:

   [T]he Immigration Judge correctly denied the respondent's application for asylum. Inasmuch as *the respondent has failed to satisfy the lower burden of proof required for asylum,* it follows that she has failed to satisfy the clear probability standard of eligibility required for withholding of deportation. .... The evidence does not establish that it is more likely than not that the respondent would be subject to persecution on account of one of the five grounds specified in ... the Act.

   (Emphasis added). This, in the context of the BIA's treatment of petitioner's situation as a

whole, indicates that the BIA recognized that in proving a "well-founded fear" of persecution for asylum purposes, the applicant's burden was less than the "more likely than not" standard applied in the withholding of deportation context.

2. The killing of her uncle also cannot be considered past persecution of Melgar. Even if Melgar could have demonstrated that her uncle was killed on the basis of his political beliefs, she fails to show how this would constitute past persecution of her. Although persecution of close family members may support a well-founded fear of future persecution, it does not form the basis for a finding of past persecution of her.

well-founded in light of the current conditions in El Salvador. The record clearly demonstrates that since the signing of the peace accords in January 1992, the country's political and social conditions have materially changed. The military organizations that Melgar claims to fear persecution from have been either reduced in size or demobilized and replaced with the National Civilian Police and the FMLN—whose cause Melgar and her uncle were supporting when they provided aid to the guerrillas—now has the second largest delegation in the country's elected legislature. *See Aguilar–Solis v. INS*, 168 F.3d 565, 565–574 (1st Cir.1999); *Cigaran v. Heston*, 159 F.3d 355, 358 (8th Cir.1998).

■■■ Although Melgar may be correct in pointing out that there may still be human rights abuses in El Salvador, the political killings have decreased considerably and the State Department Country Profiles present a positive view of conditions. The increase in general crime that has been documented in the record does not lend support to an asylum claim since a well-founded fear of persecution must be on account of an enumerated ground set forth in the Act, and general crime conditions are not a stated ground.[3] Accordingly, the change in country conditions also supports the determination that Melgar failed to demonstrate a well-founded fear of persecution on account of her and her uncle's assistance to the FMLN guerillas. In sum, the decision of the BIA was supported by substantial evidence.

*CONCLUSION*

Accordingly, we affirm the decision of the BIA and deny the petition.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from the denial of the petition of Melgar de Torres ("Melgar") for review of the decision of the Board of Immigration Appeals ("BIA" or "Board") denying her request for asylum. I would remand to the Board for further proceedings because the record plainly lends itself to a finding—based on Melgar's evidence that was found to be "believable" by both the immigration law judge ("IJ")(Decision dated July 31, 1996 ("IJ Decision"), at 7), and the BIA (*see* BIA Decision dated March 9, 1998 ("BIA Decision"), at 2 (expressly adopting "the Immigration Judge's finding that [Melgar] and her husband provided credible and detailed testimony"))—that Melgar has a well-founded fear of persecution in her native El Salvador, and because some of the language used by the IJ and the BIA creates uncertainty that the Board, in denying asylum, applied the correct legal standard.

An alien seeking asylum under the Immigration and Nationality Act must demonstrate that she is a "refugee" within the meaning of that Act, *i.e.*, that she is unwilling or unable to return to her country "because of persecution or a well-founded fear of persecution," which may be based on her membership in a cognizable "social

---

**3.** In its discussion of the country conditions in El Salvador, the BIA writes:

> We acknowledge that the Country Profile, as verified by the documentary materials submitted by the respondent, states that human rights abuses are still committed by government forces, even after implementation of the peace accords. Nonetheless, the respondent has not shown that she would be at particular risk of government persecution.

Despite the dissent's reservations, it does not appear as though the BIA, in using the above language, imposed on petitioner a higher requirement than the appropriate "well-found-

ed fear" standard. The language instead indicates that the evidence submitted regarding continuing human rights abuses was not relevant to Melgar's particular fear of persecution if she were required to return to El Salvador. This is consistent with the IJ's determination that the targets of political violence were now primarily "political leaders and corrupt officials, but not low-level supporters of the guerrilla or family members of guerrilla supporters." General violence in El Salvador does not constitute persecution, nor can it form a basis for petitioner's well-founded fear of persecution.

group." 8 U.S.C. § 1101(a)(42)(A). When the applicant has demonstrated that she has been subjected to past persecution, there is a (rebuttable) presumption that her fear of persecution, were she to return, is well-founded. *See* 8 C.F.R. § 208.13(b)(1)(i).

In *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the Supreme Court made clear that the well-founded-fear standard means that an applicant for asylum is not required to show that she "would be" persecuted, 480 U.S. at 430, 107 S.Ct. 1207 (internal quotation marks omitted), or even that the prospect of persecution is more likely than not. *See id.* at 430–32, 443–50, 107 S.Ct. 1207. In affirming the Ninth Circuit's remand to the BIA for review of an asylum application under the proper legal standard, the Supreme Court stated:

> That the fear must be "well-founded" does not ... transform the standard into a "more likely than not" one. One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.

*Id.* at 431, 107 S.Ct. 1207 (endorsing commentator's observation that if it were "known that in the applicant's country of origin *every tenth* adult male person is either put to death or sent to some remote labor camp .... it would be only too apparent that anyone who has managed to escape from the country in question will have 'well-founded fear of being persecuted' upon his eventual return." (emphasis added)). The Court concluded:

> Whether or not a "refugee" is eventually granted asylum is a matter which Congress has left for the Attorney General to decide. But it is clear that Congress did not intend to restrict eligibility for that relief to those who could prove that it is more likely than not that they will be persecuted if deported.

*Id.* at 450, 107 S.Ct. 1207.

In the present matter, the IJ found that Melgar, her uncle, and her uncle's immediate family constituted a cognizable social group. The credited evidence revealed that for years prior to 1992, Melgar had helped her uncle in giving support to the FMLN guerrillas. In January 1992, peace accords were reached between the Salvadoran government and the guerrillas. In November 1992, however, Melgar's uncle was killed; there evidently was no official investigation; the IJ, apparently accepting Melgar's belief as to responsibility for this killing, described it as "her uncle's murder by the authorities." (IJ Decision at 11.) In December 1992, Melgar, her uncle's wife, and her cousins (*i.e.*, all of the surviving adults in the social group) were raped by members of the Salvadoran military. In January 1993, a woman with whom Melgar was staying while hoping to obtain a United States visa threatened to turn Melgar and her daughters over to the military. The IJ found that Melgar seemed to have "a legitimate subjective fear, based on her past experiences." (*Id.* at 12.) (For reasons not apparent to me, however, the Board repeatedly stated that Melgar had not testified directly as to "why" she feared returning to El Salvador, (BIA Decision at 2 (noting that fact); *see id.* at 3 n.1 (noting it "again")).)

The IJ, despite finding that Melgar had a legitimate subjective fear based on her past experiences, recommended against asylum, concluding that Melgar had not demonstrated that the authorities "have taken or are inclined to take action harmful to her on th[e] basis" of her membership in her uncle's family. (IJ Decision at 9.) I question whether this premise itself applies the correct standard; it appears to require proof that if Melgar returned, persecution by the authorities would be more likely than not to occur.

More importantly, the Board itself, in accepting the IJ's recommendation to deny asylum, stated that Melgar "has not shown that she *would* be at particular risk of government persecution." (BIA Decision at 3 (emphasis added).)

As made clear in *Cardoza–Fonseca*, however, neither more-likely-than-not nor "would be" is the proper test; and it is not clear to me from either the IJ's decision or the Board's decision that the correct legal standard was applied. Accordingly, I would remand to the BIA for review of Melgar's asylum application under the proper legal standard.